Herman BLANKENSHIP,
et al., Plaintiffs,

v.

J. Kenneth BLACKWELL, Ohio
Secretary of State,
Defendant,

and

Benson A. Wolman, et al., Intervenors.

No. 2:04–CV–965.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 12, 2004.

Michael P. Cassidy, Cassidy & Associates, Independence, H, for Plaintiffs.

Arthur J. Marziale, Jr., Ohio Atty Gen'l, Columbus, OH, for Defendants.

Donald J. McTigue, Columbus, OH, for Intervenors.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Plaintiffs' combined Application for Temporary Restraining Order and Motion for Preliminary Injunction [1] seeking to allow Ralph Nader and Peter Miguel Camejo to be placed on Ohio's general election ballot this November as candidates for President and Vice President, respectively, of the United States of America. For the reasons that follow, the Plaintiffs' request (Doc. # 2) is denied. In addition, the Court considers the Motion to Intervene filed by a group of Individual Electors (Doc. # 3) and the Motion to Dismiss filed by Defendant Blackwell (Doc. # 6). These motions are granted.

### I.

Plaintiffs, Herman Blankenship, Kim Blankenship, Julie Coyle, Logan Martinez and Larry Snider [collectively referred to as "Plaintiffs"], are residents of the State of Ohio and are members of the nominating committee seeking to qualify Ralph Nader and Peter Miguel Camejo as independent joint candidates for the offices of President and Vice President of the United States. (*Complaint* at ¶¶ 6–7). Plaintiffs commenced this action on October 6, 2004 following the decision of the Defendant herein, Ohio Secretary of State J. Kenneth Blackwell, to deny ballot access in the State of Ohio to Nader and Camejo. Plaintiffs claim that the Ohio statute which requires that petition circulators be residents of the State of Ohio [2] is unconstitu-

---

**1.** Shortly after Plaintiffs' filing, the Court conducted a telephonic status conference pursuant to S.D. Ohio Local Rule 65.1. It was agreed that no discovery was necessary to resolve Plaintiffs' motion and an expedited briefing schedule on the merits was established. The Court heard argument from counsel on October 12, 2004.

**2.** Plaintiffs cite R.C. § 3501.38 in this regard. As explained *infra,* the statute at issue is actually R.C. § 3503.06.

tional in that it deprives those who sign the petitions of "their [First Amendment] rights to free speech and free association . . . ." (*Id.* at ¶ 18). The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. Before considering the merits of Plaintiffs' claim, the Court provides a brief summary of the facts giving rise to this action.[3]

On August 18, 2004, a Joint Statement of Candidacy and Nominating Petition was filed with the Office of the Ohio Secretary of State Elections Division on behalf of Ralph Nader. The nominating petition contained 14,473 signatures. (*Id.* at ¶ 21; *Sec. of State Findings of Fact and Conclusions of Law,* hereinafter "*Sec. Findings*" at 1). The Elections Division processed the nominating petition and directed the individual Ohio county boards of elections to determine the validity of petitions, part-petitions and signatures. (*Complaint* at ¶ 23; *Sec. Findings* at 1). The county boards of elections were directed to report their findings by September 3, 2004. (*Sec. Findings* at 1). On September 8, after reviewing the findings by the county boards, the Elections Division determined that a total of 6,464 signatures on the petition were valid. (*Id.* at 2).

Although the petition contained more than 5,000 signatures, the minimal requirement under Ohio law, the validity of the 6,464 signatures was challenged by a group of electors of the State of Ohio.[4] The Office of the Secretary of State held a three-day hearing on the protesters' challenge to the petition signatures. Both the protesters and candidates Nader and Camejo were represented by counsel at the hearing. (*Id.*).

On September 28, 2004, the Hearing Officer issued Findings of Fact and Conclusions of Law on the protesters' challenge. In the thirty-one page ruling, the officer concluded that there were "a number of significant problems relating to the petition, particularly in regard to the people who purportedly had circulated many of the part-petitions that were subject to the protest." (*Sec. Findings* at 2). In particular, 405 signatures were determined invalid under Ohio law because various petition circulators "did not circulate any part-petition nor witness the affixing of any signatures to a part-petition" as required by Ohio law. (*Sec. Findings* at 4, ¶ 16; 5, ¶ 18; 6, ¶ 23; 7, ¶ 29). At least one such circulator testified that he did not know who Ralph Nader is and was told that the petitions related to the same-sex marriage issue.[5] (*Id.* at 6, ¶ 26). Three hundred forty nine (349) signatures were determined invalid because two circulators could not distinguish those petitions that were lawfully circulated and those that were not, *i.e.,* those to which signatures were not witnessed. (*Sec. Findings* at 8–9). One signature was determined invalid as a forgery. (*Id.* at 7). Fifteen (15) signatures were invalidated because a circulator did not actually circulate certain petitions. (*Id.* at 19). Seventeen (17) sig-

---

3. The factual summary is taken from the Complaint as well as from the Secretary of State's Findings of Fact and Conclusions of Law, dated September 28, 2004, which both parties have agreed to make part of the record of this case.

4. The individual electors are referred to as "protestors" and include: Benson A. Wolman, Jerilyn L. Wolman, Zachery E. Manifold, Julia E. Manifold, Bassel Korker, Rebecca S. Mosher, Barry C. Keenan, Gerald L.

Robinson, Scott Austin, Mary C. Woods, Johnathon Brunner, Max Kravitz, and Daniel T. Kobil. These individuals seek to intervene in the instant action as Third–Party Defendants. The Court addresses the merits of the motion, *infra.*

5. At the time the Nader petitions were being circulated in Ohio, proponents of a constitutional amendment regarding same-sex marriage were also circulating petitions to place this issue on the November 2, 2004 ballot.

natures were invalidated because no date of signing was identified. (*Id.* at 25). Thirteen (13) signatures were invalidated based upon mathematical errors after reviewing part-petitions from a particular county boards of elections. (*Id.* at 27).

Of the greatest significance to this case, a large number of signatures were challenged because various circulators allegedly claimed on the petitions that they were residents of Ohio, when in fact they were not. A total of one thousand nine hundred fifty six (1,956) signatures were determined to be invalid because petition circulators falsely identified themselves as residents of the State of Ohio and/or did not witness the affixing of signatures to the petitions. (*Id.* at 10–24).

In particular, circulator Robert Ellis falsely attested to having a residence in Cincinnati, Ohio for the petitions in question. Three to four days prior to circulating petitions for Nader's candidacy in Ohio, Ellis circulated Marriage Protection Amendment petitions in Ohio and attested to having a residence in Dolton, Illinois. (*Sec. Findings* at 10). The evidence before the Secretary established that Ellis' claimed Ohio residence was false. Sixty six (66) signatures acquired by Ellis were excluded on account of this fraud.

Circulator Curtis Warner falsely attested to residing at an address in Cincinnati, Ohio. Warner also signed a voter registration card using the same address at the time he circulated petitions for Nader. (*Id.* at 12). One day prior to circulating petitions for Nader, Warner attested in connection with circulating Marriage Protection Amendment petitions in Ohio that his address was in Stockton, California. The evidence before the Secretary established that Warner did not reside at the Ohio address claimed and one hundred eighty nine (189) signatures acquired by Warner were invalidated on account of his fraud.

Circulator Daryl Oberg attested that he resided at an address in North Royalton, Ohio. The evidence before the Secretary of State showed that Oberg left this address in 2000 and had not returned. In 2003, Oberg was registered to vote in the State of California and claimed at least two addresses in that state. (*Id.* at 14). Oberg also used the address of a motel in Blue Ash, Ohio on certain Nader petitions he circulated. The Secretary of State concluded that Oberg had not maintained a valid residence in Ohio for at least four years. Accordingly, three hundred forty one (341) signatures which he acquired by petition circulation were invalidated.

George Woods circulated petitions using a Dayton, Ohio address of his nephew. The evidence before the Secretary of State established that Woods did not reside with the nephew and had moved to Texas, where he also registered to vote. (*Id.* at 17). Forty four (44) signatures were invalided by the Secretary of State on account of Woods' fraud.

John Laws attested that he was a resident of Lorain, Ohio on petitions he circulated in this state. The evidence before the Secretary of State established that Laws left the address in 2003 and moved to Los Angeles, California, where he registered to vote. (*Id.* at 20). Laws vacated a residence on 4207 Columbo Lane, Lorain, Ohio in the fall of 2003, according to an affidavit from his wife. Thereafter, he registered to vote in California in 2003. In 2004, he circulated petitions in Nevada and swore he resided in that state. Approximately one month before circulating petitions in Ohio for Nader, Laws circulated Nader petitions in the State of Nevada using a Las Vegas, Nevada address. The Secretary of State concluded that Laws was not an Ohio resident and invalidated five hundred forty four (544) signatures Laws acquired.

Steven Larry Laws attested that he resided in Lorain, Ohio, where he registered to vote in 1980. (*Sec. Findings* at 22). He used his 1980 address on the petition at issue in this case. His sister continues to reside at this address. When the process server came to her residence in September of 2004, she stated that her brother was in Nevada. There is no evidence that he moved back to the residence. Other evidence before the Secretary showed that Laws registered to vote in Nevada in 2000 using a Nevada hotel address and listing a Los Angeles, California address. In 2002, Laws registered to vote in California using two different California addresses. In 2003, Laws registered to vote using a third California address. (*Id.*). The Secretary of State concluded that Steven Laws is a California resident, noting that he has been indicted in that state for criminal nonsupport. (*Id.* at 23). In February 2004, Laws was sentenced on the felony to five years community control. At the hearing before the Ohio Secretary of State, Laws' attorney confirmed that Laws is a resident of California. As a result, seven hundred seventy two (772) signatures Laws acquired by circulating petitions in Ohio were invalidated.

By disallowing the total of one thousand nine hundred fifty six (1,956) signatures on account of fraudulent residency status, the Nader candidacy, on this basis alone, was left with fewer than 5,000 valid signatures, thereby failing to qualify for placement on the Presidential ballot in Ohio.

Of the 6,464 signatures, the Secretary of State disallowed 800 signatures for reasons not related to residence of the circulator. The Plaintiffs take no issue with this action

of the Secretary of State. Before considering the issue of the actual residence of the circulators, the Nader candidacy had submitted 5,646 valid signatures. The petitions circulated by Ellis, Warner, Oberg, Woods, John Laws and Steven Laws, included 1,900 signatures, all of which were excluded by the Secretary of State. Consequently, the questions of whether those petitions are valid and whether the signatures should be counted determine whether Nader should be on the Ohio Presidential ballot.

In total, the Hearing Officer recommended to the Secretary of State that 2,756 signatures be deemed invalid. As a result, the Nader petition was left with 3,708 valid signatures, which is less than the 5,000 required by Ohio law. (*Sec. Findings* at 30). As a result of this deficiency, the Secretary of State ordered that Nader and Camejo be removed from the election ballot. (*Complaint* at ¶ 31).

On October 4, 2004, the Plaintiffs herein filed a separate action in the Ohio Supreme Court seeking a writ of mandamus to "compel[ ] the Defendant to re-review certain Part–Petitions and signatures of Electors that were invalidated upon the substantiated position that profuse voter registration backlog data resulted in the failure of Boards to properly review Circulators and Elector validity against updated records." (*Id.* at ¶ 32). This matter remains pending before the Ohio Supreme Court.

In this action, Plaintiffs "focus[ ] both on a portion of the 8,009 signatures rejected at local Board review and a portion of the 2,756 signatures invalidated as a result of Defendant's acceptance of the Hearing recommendation."[6] (*Id.* at ¶ 34). Plain-

---

**6.** At oral argument, counsel for the Plaintiffs commendably acknowledged that the Plaintiffs were unable to establish the number of disqualified signatures rejected as a result of the circulators' out-of-state residence. Conse-

quently, this Court cannot determine the validity of these signatures, since the Court cannot find that validity of these names would raise the number of signatures to over 5,000.

tiffs challenge the invalidation of signatures due to the failure of circulators to meet the residency requirement of Ohio law. Plaintiffs claim that if the residency requirement is found to be unconstitutional, and the 1,956 signatures excluded by the Secretary of State are allowed, the Nader petition "will have exceeded the number of valid signatures required and Defendant will be required to certify the Candidacy and place [Nader and Camejo] on the ballot." (*Id.* at ¶ 42). Accordingly, Plaintiffs seek temporary and preliminary injunctive relief.

With this background in mind, the Court proceeds to consider the various pending motions.

## II.

### A. Motion to Intervene

The individual group of electors who commenced the protest action before the Ohio Secretary of State move for intervention in the instant case as Third–Party Defendants. The motion is made pursuant to Fed.R.Civ.P. 24(a)(2) and (b)(2). The proposed intervenors state that they "have a significant interest in the subject matter of this case ... are truly the real parties in interest here—and the existing parties may not adequately represent that interest." (*Motion to Intervene* at 2).[7]

Rule 24 allows for intervention as a matter of right as well as permissive intervention. The rule provides:

(a) **Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction

which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately protected by existing parties.

(b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed.R.Civ.P. 24(a), (b).

Intervention of right is appropriate if four requirements are satisfied: "(1) timeliness of the application to intervene; (2) the applicant's substantial legal interest in the case; (3) impairment of the applicant's ability to protect that interest in the absence of intervention; and (4) inadequate representation of that interest by parties already before the court." *Jordan v. Michigan Conference of Teamsters Welfare Fund,* 207 F.3d 854, 862 (6th Cir. 2000). With respect to timeliness, the Court considers the following five factors:

(1) the point to which the suit has progressed; (2) the purpose for which the intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his

---

**7.** The Court has been advised that the Defendant does not oppose intervention. The Plaintiffs do not necessarily oppose intervention but express concern that this case remain on an expedited track. The proposed intervenors have complied with the merits briefing schedule previously established by the Court, thereby negating the Plaintiffs' concern.

interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Id.*

■ In this case, the Court finds the Motion to Intervene is timely made. The motion was filed only one day after this action was commenced. Furthermore, no party is prejudiced by the motion and the proposed intervenors have complied with the expedited schedule established by the Court.

■ The Court also concludes that the remaining three elements necessary for intervention of right are satisfied. The proposed intervenors have a substantial legal interest in this case since they originated the challenge to Nader's ballot petition before the Ohio Secretary of State. In addition, in the absence of intervention, the proposed intervenors' ability to protect their interest may be impaired. Finally, the proposed intervenors' interest is not necessarily adequately represented by Defendant Blackwell, since the Defendant acts in the capacity of a governmental agency. As the Sixth Circuit has explained, the movant is not required to show that the representation will in fact be inadequate. Rather, the burden "is minimal because it is sufficient [to show] that representation may be inadequate." *Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1247 (6th Cir.1997) (citation omitted). As the proposed intervenors point out, they occupy a unique position in that they "have expended substantial resources to expose widespread fraud by petition circulators for the Nader campaign." (*Motion to Intervene* at 5).

In sum, the Court concludes that intervention of right pursuant to Rule 24(a) is

warranted for those individuals who commenced the protest action before the Ohio Secretary of State. In light of this conclusion, the Court need not consider the alternative motion for permissive intervention under Rule 24(b).

## B. Abstention

Both Defendant Blackwell and the Intervenors argue that the *Younger* abstention doctrine applies to this case. The doctrine, which takes its name from the Supreme Court case of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), arose in the context of a state criminal proceeding. Harris had been indicted in state court for a violation of California's Criminal Syndicalism Act. Harris then commenced an action in federal court challenging the state law on constitutional grounds. The Supreme Court held that "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good faith attempts to enforce it." *Id.* at 51, 91 S.Ct. 746. In contrast, the person seeking to enjoin a state proceeding must show that an unconstitutional statute is being enforced in bad faith, for purposes of harassment, or some other unjustifiable circumstance that would warrant federal intrusion into the state proceeding. *Id.* at 54, 91 S.Ct. 746.

■ Thus, the *Younger* doctrine counsels against a federal court interfering with a pending state court action unless unusual or drastic circumstances exist.[8] *Younger* abstention applies when the state proceeding: (1) is currently pending; (2) involves an important state interest and (3) affords the plaintiff an adequate opportunity to raise constitutional claims. *Carroll v. City of Mount Clemens,* 139 F.3d 1072, 1074 (6th Cir.1998) (citations omitted).

---

**8.** Although the Supreme Court has extended the application of *Younger* to civil proceedings, for the reasons stated *infra,* the breadth

of the extension is not as great as Defendant suggests.

The Defendant and Intervenors argue that each of these elements is satisfied. First, Defendant and Intervenors observe that the Ohio Supreme Court is currently reviewing the issues raised by Plaintiffs herein in the context of the Plaintiffs' request for writ of mandamus. Second, they assert that the issues raised in the state proceeding are matters of important state interest. Third, they argue that Plaintiffs have an adequate opportunity to present their First Amendment claim to the Ohio Supreme Court. The Court disagrees with this position.

■ As this Court observed in *Monongahela Power Co. v. Schriber*, 322 F.Supp.2d 902, 915 (S.D.Ohio 2004), abstention is "the exception, not the rule." Federal courts have the discretion to abstain from considering a case to avoid unwarranted interference with state proceedings, but the Supreme Court has discouraged declining jurisdiction on this basis because "there is no doctrine that the availability or even pendency of state judicial proceedings excludes the federal courts." *New Orleans Public Service, Inc. v. New Orleans*, 491 U.S. 350, 373, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ["*NOPSI* "]. Furthermore, as the Supreme Court observed in *NOPSI*, "[t]here is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit constitutional guarantees ...." *Id.* at 365, 109 S.Ct. 2506. According to the Supreme Court:

[I]t has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*Id.* at 368, 109 S.Ct. 2506. Indeed, as Plaintiffs point out, "[t]he *Younger* doctrine does not require abstention merely because a federal plaintiff alleging a constitutional violation in federal court, filed a claim under state law, in state court, on the same underlying facts." *Wexler v. Lepore*, 385 F.3d 1336, 1340–41 (11th Cir. 2004), citing *Rogers v. Desiderio*, 58 F.3d 299, 301 (7th Cir.1995); *Marks v. Stinson*, 19 F.3d 873, 882 (3rd Cir.1994); *Crawley v. Hamilton County Commissioners*, 744 F.2d 28, 30 (6th Cir.1984).

■ In this case, the Court is called upon to enforce an explicit constitutional guarantee. This is exactly the situation in which Supreme Court in *NOPSI* held that the federal interest is at its greatest. Thus, the Court concludes that the fact Plaintiffs have a pending action in state court based on the same underlying facts does not obviate this Court's "virtually unflagging" obligation to adjudicate a claim within its jurisdiction. *NOPSI*, 491 U.S. at 359, 109 S.Ct. 2506, citing *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988). The Court therefore declines to abstain from considering this case.[9]

---

9. The Defendant and Intervenors cite this Court's decision in *Chamber of Commerce of United States v. Ohio Elections Commission*, 135 F.Supp.2d 857 (S.D.Ohio 2001), in support of their argument for *Younger* abstention. In the *Chamber of Commerce* case, proceedings were commenced before the Ohio Elections Commission alleging certain television advertisements concerning candidates for judicial office in the State of Ohio violated two Ohio election statutes. The Chamber of Commerce later commenced an action in this court requesting that the two Ohio statutes, R.C. §§ 3517.21(B) and 3599.03(A), be declared unconstitutional on their face on First Amendment grounds. This Court declined to consider the constitutional issue on the basis of, *inter alia*, the *Younger* abstention doctrine. The Court found that Plaintiff failed to dem-

## C. Plaintiffs' Application for Temporary Restraining Order and Motion for Preliminary Injunction

Plaintiffs challenge R.C. § 3501.38 on the basis that it serves to deprive electors in this state of their rights under the First Amendment to the United States Constitution,[10] by restricting the qualifications of circulators to registered voters who are residents of Ohio. As the Defendant aptly observes, § 3501.38 sets forth the requirements for those signing nominating petitions as well as the obligations of circulators with respect to such petitions. The residency requirement for circulators is actually contained in R.C. § 3503.06, which states:

> **3503.06 Registration and residency required for voting or other acts** No person shall be entitled to vote at any election, or to sign or circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election.

R.C. § 3503.06.

According to Plaintiffs, a requirement that circulators reside in the State and are registered voters severely burdens interactive political speech and the right of association without advancing any legitimate state interest. The United States Supreme Court has never squarely addressed the issue of state residence although it has addressed the issue of voter registration.

In *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), the Court considered whether three aspects of a Colorado election statute withstood a First Amendment challenge: the requirement that initiative petition circulators be registered voters; the requirement that circulators wear a name-bearing identification badge; and the requirement that propo-

onstrate that state law would clearly bar the interposition of the constitutional claim during the course of proceedings before the Ohio Elections Commission. The record in that case demonstrated that the Elections Commission was cognizant of the constitutional standards that Plaintiff in that case sought to invoke. Further, the Elections Commission proceeding was nearing completion. Thus, this Court noted that while it was "mindful of the potential high costs that abstention [could] have in First Amendment cases generally, the costs of abstention in this case do not appear potentially high." *Id.* at 869.

The Court finds the facts in this case sufficiently distinguishable from those in the *Chamber of Commerce* case. There is no doubt that the Plaintiffs have an adequate opportunity to raise the constitutional claim in the state proceedings. In the context of a Presidential election, there is at least an equal, if not paramount, federal interest in the question raised in this Court. The election in question is to occur twenty-one days from issuance of this *Opinion and Order*. The questions raised in this case are exclusively addressed to constitutional issues. If this Court were to abstain, there is a substantial likelihood that the election would occur without any meaningful review by the federal courts regarding an issue arising exclusively under the federal Constitution. In contrast, this Court abstained in *Chamber of Commerce of United States v. Ohio Elections Commission*, which involved campaign activity in a state election which had already occurred. In that case, the state had more paramount interest in a state election. The case before the Ohio Election Commission had been pending for an extended period of time. Subsequent review in both state and federal court would not be frustrated, as in this case, because of an impending election. In addition, the *Chamber of Commerce* case was essentially an enforcement action, making *Younger* abstention appropriate. In sum, the situation presented in *Chamber of Commerce* is entirely different from the case at bar.

10. The First Amendment states that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. Amend. 1.

nents of an initiative report the names and addresses of all paid circulators and the amount paid to each such circulator. The Court concluded that the restrictions "significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Id.* at 192, 119 S.Ct. 636.

The Court noted that the question before it was only whether circulators had to be registered to vote in Colorado, which the Court held was an unconstitutional burden in violation of the First Amendment. A majority of the Court expressly declined to address whether a state law requirement that circulators reside within the state could withstand constitutional scrutiny. *Id.* at 197, 119 S.Ct. 636. In the same opinion, Justice Thomas, *Id.* at 211, 119 S.Ct. 636, Justices O'Connor and Breyer, *Id.* at 217, 119 S.Ct. 636, and Chief Justice Rehnquist, *Id.* at 226, 119 S.Ct. 636, assert that a state could constitutionally require a circulator to be a resident of the state.

Various federal courts have confronted this issue. Some have upheld state residency requirement statutes: *Initiative & Referendum Institute v. Jaeger,* 241 F.3d 614 (8th Cir.2001); *Idaho Coalition United for Bears v. Cenarrusa,* 234 F.Supp.2d 1159 (D.Idaho 2001); *Kean v. Clark,* 56 F.Supp.2d 719 (S.D.Miss.1999). Other courts have found state residency requirements a violation of the First Amendment: *Krislov v. Rednour,* 226 F.3d 851 (7th Cir.2000); *Chou v. New York State Board of Elections,* 332 F.Supp.2d 510 (E.D.N.Y. 2004); *Morrill v. Weaver,* 224 F.Supp.2d 882 (E.D.Pa.2002); *Young v. Illinois State Board of Elections,* 116 F.Supp.2d 977 (N.D.Ill.2000). Two courts have found a requirement for residency in a district to be a violation of the First Amendment. *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135 (2nd Cir.2000); *Frami v. Ponto,* 255 F.Supp.2d 962 (W.D.Wis.2003).[11]

In *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 149 (2nd Cir.2000), the court described a state's interest in "ensuring integrity and preventing fraud in the electoral process" as "unquestionably compelling." The court also noted that if state elections officials could "establish that the use of non-resident petition circulators did *in fact* pose a demonstrable threat to the integrity of the signatures collection process," the state interest in restricting the qualifications of circulators would be entitled to greater weight and deference. *Id.,* citing *Schulz v. Williams,* 44 F.3d 48, 57 (2nd Cir.1994) (emphasis added).

As the Supreme Court observed in *Buckley v. American Constitutional Law Foundation, Inc., supra,* there is no "litmus-paper test" to distinguish "valid ballot-access provisions from invalid interactive speech restrictions." 525 U.S. at 192, 119 S.Ct. 636. In short, courts addressing constitutional challenges to state ballot access requirements are called upon to make "hard judgments" but to be "vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas" which the First Amendment protects. *Id.*

In this case, the Ohio statute at issue, § 3503.06, requires that circulators be "registered as an elector" and "reside[ ] in the county and precinct where the person is registered . . . ." In view of the *Buckley v. American Constitutional Law Foundation* decision, it appears clear that the requirement of Ohio law that circulators be

**11.** The Court notes that Plaintiffs rely on these two cases but the Court finds them inapposite since Ohio law has no district residency requirement, only a state residency requirement.

registered voters is unconstitutional.[12] Moreover, although *Buckley* did not address the constitutionality of a state residency requirement, the Court nevertheless has every reason to assume that the decision applies to this case.[13]

It is clear that the requirement of Ohio law that circulators must be residents is a restriction on the guarantees of the First Amendment. The Supreme Court instructs that severe burdens on speech trigger a strict standard of review in which regulations must be narrowly tailored to serve a compelling state interest. Less severe burdens on speech are subject to a more lenient standard of review in federal court. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). The Court concludes that the Ohio law at issue should be reviewed under a strict scrutiny analysis as it clearly infringes on the extent of ballot-related activity protected by the First Amendment. As the Supreme Court observed in *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." As further explained in *Buckley v. American Constitutional Law Foundation, supra,* "[p]etition circulation . . . is core political speech" during which "First Amendment

protection . . . is at its zenith." 525 U.S. at 186–87, 119 S.Ct. 636.

The Defendant contends that the law serves a compelling interest of the state "to protect the integrity of the petition process." (*Defendant's Memorandum contra* at 5). The Supreme Court has recognized that the state's interest in protecting the integrity and fairness of the electoral process is paramount. In *Burson v. Freeman*, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5(1992), the Court expressed this interest in the following way:

> [T]he "right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Accordingly, this Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence. . . . The Court also has recognized that a State "indisputably has a compelling interest in preserving the integrity of its election process." The Court thus has "upheld generally appli-

---

**12.** In theory only, Plaintiffs have a strong case to challenge the voter registration requirement in view of the *Buckley* decision. This was not, however, the primary basis under which the Secretary of State invalidated signatures obtained by petition circulators for Nader in this state. The Secretary emphasized that the circulators were not citizens of Ohio, although some mention is made that some circulators were additionally not registered Ohio voters. Furthermore, the fact that the voter registration requirement may be unconstitutional does not invalidate the entirety of R.C. § 3503.06 as to the requirement of state residence. Under Ohio law, there is a

legislative mandate in favor of severability. R.C. § 1.50 states:

> If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

R.C. § 1.50.

**13.** For the reasons stated *infra,* however, the Court declines to pass on the constitutionality of the state residency requirement in Ohio.

cable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze,* 460 U.S. 780, 788, n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547(1983) (collecting cases). In other words, it has recognized that *a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process.*

*Id.* at 199, 112 S.Ct. 1846 (emphasis added).

Nevertheless, the Supreme Court has stated that an asserted interest by the state in preventing fraud, while "important in the abstract," does not require a court to accept the state's expressed concern. *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The Supreme Court has thus cautioned that purported fears of fraud, rather than actual fraud in the electoral process, may not be sufficient to justify limitation on activities otherwise protected by the First Amendment.

The record in this case is replete with credible, unchallenged instances of actual fraud in the circulation of petitions. The Ohio Secretary of State has detailed numerous and substantial instances of fraud on the part of petition circulators for the Nader petition ballot. Not only were various petition circulators non-residents of this State, they engaged in outright fraud by using false addresses to purportedly satisfy Ohio law. In addition, circulators engaged in additional acts of fraud by falsely attesting that petitions were circulated when they were not and by falsely attesting to signatures. After consideration of the evidence, the Secretary of State not only decided to exclude Nader's placement on the ballot but also recommended that a criminal investigation be undertaken. (*Sec. Findings* at 30–31). Ohio law has

long required the invalidation of all signatures on a petition if it has been found that the circulators falsely swore to any fact on the petition and the method of signing. R.C. § 3501.38; § 3501.39; *State ex rel. Comm. for the Referendum of City of Lorain Ordinance No. 77–01 v. Lorain County Bd. of Elections,* 96 Ohio St.3d 308, 774 N.E.2d 239 (2002); *State ex rel. Citizens for Responsible Taxation v. Scioto County Board of Elections,* 65 Ohio St.3d 167, 602 N.E.2d 615 (1992). The Plaintiffs have not asserted that these provisions of Ohio law are unconstitutional.

■ In reviewing the Secretary's Findings, it is clear that not only were signatures rendered invalid because petition circulators falsely attested that they were residents of the State of Ohio, but also because they engaged in other forms of fraud in obtaining the signatures. The fraud among petition circulators was widespread and took various forms. Seven hundred seventy (770) signatures were invalidated because circulators did not actually circulate petitions and could not distinguish between those actually circulated and those not circulated. As stated above, one thousand nine hundred fifty six (1,956) signatures were invalidated for false residency. An additional thirty (30) signatures were invalidated for other reasons.

In light of this fraud, the Court concludes that it is unnecessary to delve into the constitutional issue presented. Regardless of how the Court would resolve the question of whether a state law requiring circulators to be state residents is constitutional, the fact remains that the signatures would be excluded on the grounds of several forms of fraud on the part of the circulators. Thus, the Court finds that Plaintiffs have failed to meet a threshold requirement for this Court to even consider the constitutional issue.[14]

14. In the Court's view, this case is wholly different from one in which out-of-state circu-

lators, untainted by fraud, challenge a resi-

█ Federal courts are obligated not to "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). In this case, even if the residency requirement were held to be unconstitutional, Ohio law would require the invalidation of all names on petitions signed by circulators who fraudulently claimed that they lived in Ohio. As noted in *Ashwander*, in such circumstances, it is improper for a federal court to consider striking down as unconstitutional a state law, if such action does not effect the outcome of the case. Because the Secretary of State invalidated the challenged names on the independent basis of fraud, this Court declines to address Plaintiffs' constitutional challenge to R.C. § 3503.06.

█ The Court notes that the Intervenors also argue that the doctrine of "unclean hands" applies to this case. The unclean hands doctrine refers to the maxim that one who seeks equitable relief in the form of an injunction must do so with "clean hands." *See Keystone Driller Co. v. General Excavator Co., et al.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). In other words, because a court may only issue an injunction if the law favors the party seeking the injunction, and fairness and equity support the relief, a wrongdoer has been traditionally denied the benefit of an injunction. This doctrine is not applied as a punishment but rather to further "the advancement of right and justice." *Id.* at 245, 54 S.Ct. 146.

█ According to the Intervenors, the Plaintiffs should not be entitled to seek equitable relief in view of the widespread fraud found by the Secretary of State.

The Court agrees with this argument as an alternative basis to deny the relief sought by the Plaintiffs. As the Supreme Court long-ago observed: " 'The equitable powers of this court can never be exerted in behalf of *one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.* To aid a party in such a case would make this court the a better of iniquity.' " *Id.* at 245, 54 S.Ct. 146 (emphasis added), quoting *Bein v. Heath*, 47 U.S. 228, 6 How. 228, 247, 12 L.Ed. 416 (1848). The magnitude of the fraud described by the Secretary of State in the Findings of Fact and Conclusions of Law are far too great for this Court to consider granting the equitable relief of an injunction in the Plaintiffs' favor.

**D. Defendant Blackwell's Motion to Dismiss**

In addition to opposing the Plaintiffs' requests for injunctive relief, Defendant Blackwell moves to dismiss this action for the reasons stated in his opposition memorandum. As explained above, the Court's decision rests on different grounds than those argued by the Defendant. Nevertheless, the Court finds that dismissal of this action is appropriate since Plaintiffs are not entitled to equitable relief from this Court.

**III.**

In light of the foregoing, the Plaintiffs' combined Application for Temporary Restraining Order and Motion for Preliminary Injunction (**Doc. # 2**) is **DENIED**. The Motion by the Individual Electors to Intervene (**Doc. # 3**) is **GRANTED**. Defendant Blackwell's Motion to Dismiss (**Doc. # 6**) is **GRANTED**.

---

dency statute on First Amendment grounds. In such a case, the Court would consider the

First Amendment issue.

This action is hereby **DISMISSED.** The Clerk is **DIRECTED** to enter Judgment in favor of Defendant Blackwell and the Intervenors.

**IT IS SO ORDERED.**